`IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                   No. CR 06-0537 JB

JOSE CRUZ RODRIGUEZ-RODRIGUEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Jose Cruz Rodriguez-Rodriguez'

Motion to Suppress Physical Evidence and Statements, filed April 17, 2006 (Doc. 24)("Motion to

Suppress").  The Court held an evidentiary hearing on the motion on May 30, 2006.  The primary

issue is whether the Court should suppress the physical evidence and the statements secured as a

result of the police officers' stop of Rodriguez-Rodriguez in reliance on radio bulletins that other

officers issued.  Because the officer issuing the bulletin had a reasonable suspicion to stop

Rodriguez-Rodriguez' vehicle, and because the detention did not exceed the scope of the original

search, the Court will deny the motion to suppress.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential

findings on the record when deciding a motion that involves factual issues.  The findings of fact in

this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of

rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules

of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence, including the legality of a search or seizure and the voluntariness of an individual's

confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).

In deciding such preliminary questions, the Court is not bound by the rules of evidence except for

those rules related to privileges. See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay

in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

  In his motion, Rodriguez-Rodriguez contended that, upon his counsel's information and

belief, and based on discovery already disclosed to him in the general course of discovery, the United

States would elicit certain testimony at an evidentiary hearing from its witnesses.  At the hearing,

however, the testimony established the facts as follows:

  1.  On December 18, 2005, at approximately 4:30 a.m., Officer Michael Marquez of the

Santa Clara Police Department observed a brown 2000 Dodge pickup truck with an extended cab

heading westbound on U.S. Highway 180 near Santa Clara, New Mexico.  See Motion to Suppress

at 2; United States' Response to Defendant's Motion to Suppress Physical Evidence and Statements

at 1, filed April 20, 2006 (Doc. 27)("Response"); Transcript of Morning Hearing at 6:18-23

(Marquez)(taken May 30, 2006)("A.M. Transcript").[1]

  2.  Marquez also observed the Dodge pickup truck was following a red Nissan Sentra

driving westbound on U.S. Highway 180.  See Motion to Suppress at 3; Response at 1; A.M.

Transcript at 7:1-3 (Marquez).

  3.  Given the late hour, that these two vehicles were the only ones in the area, and that

---

  [1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.  The
original transcript is divided into two portions, a transcript of morning proceedings and a transcript
of afternoon proceedings.  The Court will refer to these portions separately as "A.M. Transcript" and
"P.M. Transcript," because they are not consecutively paginated.

he observed that both had California license plates, Marquez began following the two vehicles.  See Motion to Suppress at 3; Response at 1; A.M. Transcript at 7:3-4 (Marquez).

4.      According to Marquez, the Dodge vehicle appeared to be riding "slightly low" in the rear, which made him suspect that it might contain a hidden cache of contraband.  Motion to Suppress at 2.  See Response at 1; A.M. Transcript at 9:18-21.

5.      Because of these observations and his deduction, Marquez followed the two vehicles for approximately one mile, during which time he noticed the Nissan swerving between the lanes, and committing traffic violations.  See Motion to Suppress at 2; Response at 1-2; A.M. Transcript at 8:22 - 9:6; 14:13-25 (Marquez).

6.      While engaged in this tailing activity, Marquez noticed that the pickup truck did not have a light illuminating the license plate, in violation of New Mexico traffic laws, and so he activated his service lights to conduct a traffic stop.  Motion to Suppress at 2; Response at 1; A.M. Transcript at 7:18-22 (Marquez).

7.      As the pickup truck pulled to the side of the road and Marquez effected a traffic stop, he also radioed to other law enforcement officers in the area asking for assistance in locating the Nissan, and requesting that the Nissan be stopped for a "welfare check" -- a stop to make sure the driver is okay and in condition to drive.  Motion to Suppress at 3; Response at 2; A.M. Transcript at 17:18-24; 60:9-22 (Marquez).

8.      Marquez approached the pickup truck and asked the driver for his license and registration for the pickup.  See A.M. Transcript at 19:11-13 (Marquez).

9.      The driver refused to identify himself, and stated that he could not produce a driver's license.  See A.M. Transcript at 19:13-25 (Marquez).

10.     The driver acknowledged that he was an illegal alien from Mexico.  Accordingly, Marquez called the Border Patrol to alert it that he had detained an illegal alien, and the Border Patrol indicated that it would send an agent to him.  See A.M. Transcript at 20:21-24 (Marquez).

11.     As Marquez was speaking with the driver of the pickup truck, he detected an odor of marijuana coming from the pickup truck.  See A.M. Transcript at 21:1-2 (Marquez).

12.     Marquez noticed a bundle in the rear seat and asked the driver what was in the bundle. See A.M. Transcript at 21:9-10 (Marquez).

13.     The driver responded that the bundle contained dirty laundry.  See A.M. Transcript at 21:10-11 (Marquez).

14.     Marquez asked the driver for permission to search the rear bed of the pickup truck. See A.M. Transcript at 22:9-12 (Marquez).

15.     The driver agreed to open the rear bed of the pickup truck.  The driver exited the pickup truck, unlocked the bed cover, and lifted the cover up.  See A.M. Transcript at 22:14-16 (Marquez).

16.     Marquez noticed multiple bundles in the truck bed similar to the one he had observed in the rear seat of the truck, and he detected a strong scent of marijuana emanating from the truck bed.  The driver told Marquez that these bundles also contained clothes.  See A.M. Transcript at 23:5-16 (Marquez).

17.     Marquez asked the driver to close the truck bed and to get back into the vehicle.  See A.M. Transcript at 23:25 - 24:3 (Marquez).

18.     After asking the driver to return to his vehicle, Marquez telephoned Chief Paul Jasso, who was at home, and explained that he had stopped a vehicle that he believed could contain a load

of marijuana.  Marquez also called the Grant County Sheriffs Department and requested backup.

See A.M. Transcript at 24:23 - 25:8; 26:2-6 (Marquez); Transcript of Afternoon Hearing at 41:18-23

(Jasso)(taken May 30, 2006)("P.M. Transcript").

      19.     As Marquez was calling for backup, the driver jumped out of the pickup truck and

began running west on U.S. Highway 180 away from the area.  See A.M. Transcript at 26:17-20

(Marquez).

      20.     Marquez was able to catch the driver by his sweatshirt, but the driver managed to

wiggle free of the sweat shirt, jumped over a barbed-wire fence, and headed into the desert.  For his

safety, Marquez did not chase the driver.  See A.M. Transcript at 26:21-27:6 (Marquez).

      21.     Deputy Adam Arellano of the Grant County Sheriff's Department arrived on the

scene.  Marquez explained what had happened to Arellano.  Arellano called central dispatch and

reissued an attempt to locate the red Nissan.  See A.M. Transcript at 67:18-22 (Arellano).

      22.     When Jasso arrived on the scene, Marquez pointed out the bundles which he believed

to be marijuana.  The officers also noticed two cellular telephones located in the center console of

the truck.  Jasso directed Marquez to call a tow truck and to have the pickup truck brought to the

Santa Clara Police Department. See A.M. Transcript at 29:6-18 (Marquez); P.M. Transcript at 63:5-9

(Jasso).

      23.     At approximately 5:30 a.m., Arellano received a call from Deputy Anthony Bencomo

indicating that Bencomo had stopped the red Nissan on eastbound U.S. Highway 180 near an

EconoLodge motel in Silver City, New Mexico.  That location is approximately six miles from

where Marquez had stopped the pickup truck.  See A.M. Transcript at 70:1-7 (Arellano).

      24.     Bencomo did not observe the red Nissan driving erratically or making any evasive

movements.  See P.M. Transcript at 27:16-21 (Bencomo).

25.     Arellano proceeded to the site where Bencomo had stopped the red Nissan.  After arriving at the site, Arellano called Jasso over the radio and informed him that officers had stopped the other vehicle for which Marquez had asked law enforcement to look.  See A.M. Transcript at 71:2-6 (Arellano).

26.     Bencomo chose the location near the EconoLodge because he understood from dispatch transmissions that the stop might involve narcotics, and wished to pull the red Nissan over in a well-lit area.  See P.M. Transcript at 10:19-24 (Bencomo).

27.     As Bencomo began to approach the vehicle, a Silver City Police Department patrol unit arrived on the scene and parked behind Bencomo's vehicle.  See P.M. Transcript at 14:14-18 (Bencomo).

28.     Upon being pulled over, the driver of the red Nissan, Rodriguez-Rodriguez, denied having any association with the pickup truck that Marquez had stopped earlier.  See A.M. Transcript at 84:18-21.

29.     Rodriguez-Rodriguez produced a valid driver's license, registration, and insurance paperwork for the vehicle.  The vehicle was registered to an individual other than Rodriguez-Rodriguez; Rodriguez-Rodriguez identified this individual as his father-in-law.  See A.M. Transcript at 81:25-82:2 (Arellano); P.M. Transcript at 17:21-25 (Bencomo).

30.     Rodriguez-Rodriguez told Bencomo that he was coming from his brother's house, that his brother lived nearby, and that he was returning to Palomas, Mexico to fix the vehicle.  See P.M. Transcript at 18:18-21.

31.     When he arrived on the scene, Arellano asked Rodriguez-Rodriguez if he had any

-6-

handguns, hand grenades, or narcotics and for permission to search the car.  Rodriguez-Rodriguez granted Arellano permission to search the car.  <u>See</u> A.M. Transcript at 71:18-25 (Arellano); P.M. Transcript at 21:19-21 (Bencomo).

32.     Arellano was aware that the driver of the pickup truck had fled, and so placed Rodriguez-Rodriguez in investigative detention during the search of the Nissan.  Rodriguez-Rodriguez was placed in handcuffs and seated in Bencomo's patrol vehicle.  <u>See</u> A.M. Transcript at 74:14-17.

33.     Arellano advised Rodriguez-Rodriguez that he was not under arrest, but was under investigative detention.  <u>See</u> A.M. Transcript at 77:4-7 (Arellano).

34.     The officers did not discover any contraband during the search of the Nissan.  <u>See</u> A.M. Transcript at 75:7-8 (Arellano); P.M. Transcript at 22:6-8 (Bencomo).

35.     Arellano called Jasso over the radio and told him that he had searched the vehicle. Jasso asked Arellano if there was a cellular telephone in the car or in possession of Rodriguez-Rodriguez, and asked Arellano to secure any cellular telephone.  <u>See</u> A.M. Transcript at 75:13-16 (Arellano); P.M. Transcript at 43:13-17 (Jasso).

36.     Arellano took possession of a cellular telephone from Rodriguez-Rodriguez' person, placed it on top of the trunk area of the Nissan, and waited for Jasso to arrive.  <u>See</u> A.M. Transcript at 76:3-6.

37.     When Jasso arrived, Arellano asked Rodriguez-Rodriguez for permission to go through his telephone, and he agreed.  Rodriguez-Rodriguez was still handcuffed and seated in Bencomo's car when this request was made.  <u>See</u> A.M. Transcript at 76:21-77:3 (Arellano); P.M. Transcript at 22:21-25 (Bencomo).

38.     Arellano did not tell Rodriguez-Rodriguez that he did not have to consent to having his cellular telephone searched.  See A.M. Transcript at 85:4-8 (Arellano); P.M. Transcript at 34:7-13 (Bencomo); id. at 61:14-21 (Jasso).

39.     Jasso reviewed the last several dialed numbers in Rodriguez-Rodriguez' cellular telephone.  During this examination, Jasso was also in possession of the two cellular telephones found in the pickup truck that Marquez had stopped earlier.  See Motion to Suppress at 3; Response at 3; A.M. Transcript at 77:22-23 (Arellano); P.M. Transcript at 46:18-47:11 (Jasso).

40.     Jasso dialed the last number called on Rodriguez-Rodriguez' cellular telephone, which caused one of the cellular phones previously found in the pickup truck to begin ringing.  See Motion to Suppress at 3-4; Response at 3; P.M. Transcript at 47:12-18 (Jasso).

41.     After linking the two cellular telephones, Jasso had the officers transport Rodriguez-Rodriguez to the Santa Clara Police Department until the officers could locate the driver of the pickup truck that Marquez had stopped.  The officers were directed not to question Rodriguez-Rodriguez.  See Motion to Suppress at 4; P.M. Transcript at 47:23-48:3 (Jasso).

42.     At the Santa Clara Police Department, Jasso read Rodriguez-Rodriguez his Miranda rights and advised him that he did not have to talk to officers.  See P.M. Transcript at 50:3-10 (Jasso).

43.     Rodriguez-Rodriguez was handcuffed during the interview with Jasso.  See P.M. Transcript at 57:1-6 (Jasso).

44.     Rodriguez-Rodriguez stated to Jasso that he had been traveling to Silver City to visit his brother on Pine Street.  He stated that he experienced car trouble and had begun to return to Mexico to repair the vehicle.  See P.M. Transcript at 50:13-18 (Jasso).

45.     When asked if he would like assistance notifying his brother that he was in town, Rodriguez-Rodriguez indicated that he did not know his brother's address and that his brother did not have a telephone.  See P.M. Transcript at 50:21-51:1 (Jasso).

46.     The registration paperwork that the law enforcement officers had procured from the driver of the pickup truck indicated that the truck was registered to Martin Nunez; the registration paperwork that the law enforcement officers had procured from Rodriguez-Rodriguez indicated that the Nissan was registered to Martin Rivas.  Both vehicles were registered to the same address.  See P.M. Transcript at 52:8-10 (Jasso).

47.     Rodriguez-Rodriguez indicated that he did not know Nunez or Rivas.  See P.M. Transcript at 52:19-24 (Jasso).

48.     Jasso asked Rodriguez-Rodriguez why his cellular phone called one of the telephones found in the Dodge pickup truck.  Rodriguez-Rodriguez responded that "everybody has the same number."  P.M. Transcript at 53:9-10 (Jasso).

49.     At approximately noon that day, law enforcement officers apprehended the driver of the Dodge pickup truck, Hiram Gallardo-De La Cruz, and transported Gallardo-De La Cruz to the Santa Clara Police Department.  Rodriguez-Rodriguez and Gallardo-De La Cruz were able to see each other when officers entered with Gallardo-De La Cruz.  See P.M. Transcript at 53:22-54:2 (Jasso).

50.     Jasso left Rodriguez-Rodriguez to interview Gallardo-De La Cruz.  Gallardo-De La Cruz told Jasso that he and Rodriguez-Rodriguez knew each other, that Rodriguez-Rodriguez was assisting him in transporting marijuana to Compton, California, and that both Gallardo-De La Cruz and Rodriguez-Rodriguez were from Compton.  See P.M. Transcript at 54:3-5 (Jasso).

-9-

51.     After interviewing Gallardo-De La Cruz, Jasso returned to Rodriguez-Rodriguez; Jasso re-advised him that he did not need to make any further statements, and then told him that he knew the truth.  <u>See</u> P.M. Transcript at 54:9-12 (Jasso).

52.     Rodriguez-Rodriguez responded that he had been lying and that: (i) Martin Nunez and Martin Rivas are the same person; (ii) he was married to Martin Rivas Nunez' daughter; (iii) he did not want to lose his resident status because he was from Mexico; and (iv) both he and Gallardo-De La Cruz were from Compton.  <u>See</u> P.M. Transcript at 54:12-18 (Jasso).

53.     Rodriguez-Rodriguez indicated that he and Gallardo-De La Cruz were working together to transport the marijuana to Compton.  Rodriguez-Rodriguez admitted that he was paid $700.00 for his assistance in delivering the marijuana.  <u>See</u> Motion to Suppress at 4; Response at 5; P.M. Transcript at 55:17-19 (Jasso).

54.     Rodriguez-Rodriguez signed a consent to search form for the red Nissan.  <u>See</u> Motion to Suppress at 4; Response at 4.

55.     A drug detection dog inspected the Nissan.  The dog "alerted" law enforcement to areas on the steering wheel, driver panel, and to a pair of gloves on the rear floor board.  No drugs, however, were found in the vehicle.  <u>See</u> Motion to Suppress at 4; Response at 4.

## PROCEDURAL BACKGROUND

Rodriguez-Rodriguez moves the Court, pursuant to rules 12(b)(3) and 26.2 of the Federal Rules of Criminal Procedure, for an order suppressing from use at the trial the following evidence, which he contends was unlawfully seized: (i) any physical evidence, including but not limited to, a cellular telephone and a pair of gloves seized from him and the vehicle he was driving as a direct and indirect result of an unlawful traffic stop executed on his vehicle near Silver City, New Mexico on

-10-

December 18, 2005; (ii) any observations of Rodriguez-Rodriguez by the arresting police officer(s) who conducted the allegedly unlawful traffic stop of Rodriguez-Rodriguez' vehicle; (iii) the results of a "canine search" of the vehicle conducted as a direct and indirect result of the allegedly unlawful traffic stop; (iv) the police's "seizure" of Rodriguez-Rodriguez' consent to inspect his cellular telephone accomplished as a direct and indirect result of the allegedly unlawful traffic stop; (v) the results of the "last number dialed" test on Rodriguez-Rodriguez' cellular telephone and any other inspection of his telephone the police conducted as a result of the traffic stop; and (vi) any other evidence, including physical evidence and statements, obtained as a direct or indirect result of the exploitation of the allegedly unlawfully seized evidence. See Motion to Suppress at 1-2. The United States argues that the stop of the red Nissan Rodriguez-Rodriguez was driving "was firmly based on reasonable suspicion of traffic violations and involvement in the marijuana trafficking." Response at 9. The United States requests that the Court deny Rodriguez-Rodriguez' motion.

## FOURTH AMENDMENT LAW

1. **Reasonable Suspicion of Traffic Violations.**

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. The Supreme Court of the United States has held that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-810 (1996). Consequently, an automobile stop is subject to the constitutional imperative that it be objectively reasonable under the circumstances. See Ohio v. Robinette, 519 U.S. 33, 38 (1996); Delaware v. Prouse, 440 U.S. 648,

654 (1979); Terry v. Ohio, 392 U.S. 1, 21 (1968).

Consistent with the Supreme Court's classification of a traffic stop as an investigative detention, the United States Court of Appeals for the Tenth Circuit has identified two questions as being relevant to the determination whether a traffic stop is constitutional: (i) "whether the officer's action was justified at its inception;" and (ii) "whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Bustillos-Munoz, 235 F.3d 505, 512 (10th Cir. 2000)(internal quotations omitted). See United States v. Concepcion-Ledesma, 447 F.3d 1307, 1312 (10th Cir. 2006). Among other legitimate reasons, the Supreme Court has endorsed the general rule that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. at 810. Thus, in analyzing the first inquiry, the Tenth Circuit has ruled that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995)(en banc).

A stop is reasonable if the "particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Alvarado, 430 F.3d 1305, 1308 (10th Cir. 2005)(quoting United States v. Zabalza, 346 F.3d 1255, 1258 (10th Cir. 2003)). In applying this standard, the Supreme Court has recognized that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Moreover, "an officer with reasonable suspicion need not 'rule out the

-12-

possibility of innocent conduct' as long as the totality of the circumstances suffices to form 'a particularized and objective basis' for a traffic stop." United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)(quoting United States v. Arvizu, 534 U.S. 266, 277-78 (2002)).  Nevertheless, despite this liberal standard, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop . . . [and t]he officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. at 123-24.

Once a traffic stop has been effected, the driver may be constitutionally detained only so long as the officer's subsequent conduct is reasonably related in scope to the circumstances that justified the initial stop "unless the officer has an objectively reasonable suspicion that illegal activity unrelated to the stop has occurred or the driver otherwise consents to the encounter." United States v. Edgerton, 483 F.3d 1043, 1047 (10th Cir. 2006).  The scope of an investigative detention must be related to its initial justification, and the detention "must 'last no longer than is necessary to effectuate the purpose of the stop.'" United States v. Millan-Diaz, 975 F.2d 720, 721 (10th Cir. 1992)(quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).  To remain constitutional under the Tenth Circuit's second inquiry, "once the purpose of the stop is satisfied and any underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay." United States v. Edgerton, 483 F.3d at 1047.

**2.      Bulletin Stops.**

The Supreme Court has indicated that a vehicle may be validly stopped in response to a bulletin or BOLO ("be on the lookout for") call.  See United States v. Hensley, 469 U.S. 221, 233 (1985).  In United States v. Hensley, the Supreme Court held that evidence uncovered in the course

of a bulletin stop is admissible "if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop." Id. See United States v. Hinojos, No. 93-5242, 1996 U.S. App. LEXIS 611, at *13 (10th Cir. Jan. 18, 1996)("[A] police flyer or bulletin may provide objective justification for a Terry stop by an officer, but only if the flyer itself is based on reasonable suspicion.");[2] United States v. Gonzales, 897 F.2d 504, 506 (10th Cir. 1990). Finally, the exigencies of law enforcement work mandate that the propriety of the stop does not "turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance." United States v. Hensley, 469 U.S. at 231.  Police officers are entitled "to rely on the observations, statements, and conclusions of their fellow officers" and are not required to reevaluate the original officer's grounds for suspicion.  Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998)(citing  United States v. Hensley, 469 U.S. at 230-33).

## ANALYSIS

The stop of the red Nissan Rodriguez-Rodriguez was driving was based on reasonable suspicion of traffic violations and involvement in the marijuana trafficking.  The questioning and detention of Rodriguez-Rodriguez was reasonably related to the scope of the initial stop. Accordingly, the Court will deny his motion to suppress.

## I.   THE STOP OF RODRIGUEZ-RODRIGUEZ WAS PROPERLY EXECUTED IN RESPONSE TO A VALID BULLETIN BASED ON REASONABLE SUSPICION.

Rodriguez-Rodriguez contends that reasonable suspicion did not exist for law enforcement

---

[2]The Tenth Circuit Rule 36.3(B) states: "Citation to an unpublished decision is disfavored. But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition."  This unpublished decision meets both these criteria, and the rules therefore allow citation to this unpublished decision.

officers to effect a traffic stop of the red Nissan he was driving.  Rodriguez-Rodriguez appears to argue that Marquez issued his bulletin because he observed the red Nissan traveling in front of Gallardo-De La Cruz' pickup truck, in the same direction, and that both vehicles had California license plates.  Rodriguez-Rodriguez characterizes the bulletin as "operating on a hunch" and conducting a "fishing expedition."  P.M. Transcript at 73:24-25 (Esparza).  Because the Court finds Marquez' testimony that the red Nissan was driving erratically credible, and because, by the time Bencomo stopped Rodriguez-Rodriguez, officers had information indicating Rodriguez-Rodriguez might be involved in a scheme to transport marijuana, the Court finds reasonable suspicion existed and the traffic stop of Rodriguez-Rodriguez was constitutionally valid.

A.    **MARQUEZ HAD REASONABLE SUSPICION TO EXECUTE A TRAFFIC STOP.**

Rodriguez-Rodriguez attaches great importance to the fact that the officer who actually stopped the red Sentra, Bencomo, had not seen any traffic violation or other evidence that the driver may have committed a crime.  See Motion to Suppress at 5; P.M. Transcript at 27:16-21 (Bencomo). Rodriguez-Rodriguez acknowledges that "[a] vehicle may be validly stopped based on . . . a bulletin or BOLO," but argues that "the information contained therein must be sufficient to satisfy the arresting officer that reasonable suspicion to stop the vehicle exists."  Motion to Suppress at 4-5. This assertion is an incorrect statement of the law.  The propriety of Bencomo's stop does not turn on whether Bencomo personally observed Rodriguez-Rodriguez drive impermissibly or commit a crime.  Nor does it turn on whether Marquez and Arellano stated in their bulletins all the facts that constituted their reasonable suspicion.  See United States v. Hensley, 469 U.S. at 231 (holding the propriety of a traffic stop "does not turn on whether those relying on the flyer were themselves aware

of the specific facts which led their colleagues to seek their assistance.").   Bencomo, and other officers who responded to the bulletin, were entitled to rely on Marquez' observations, statements, and conclusions, and the stop of Rodriguez-Rodriguez was constitutional if Marquez had reasonable suspicion to justify the stop.  See id. at 233.

As Marquez began following the pickup truck and the Nissan, he observed the Nissan swerving, crossing the center line, and driving onto the shoulder.  See P.M. Transcript at 8:22-9:6; 14:13-25 (Marquez); N.M. Stat. Ann. § 66-8-113 (prohibiting reckless driving); N.M. Stat. Ann § 66-7-308 (requiring drivers to remain on the right side of a roadway).  Based on these observations, Marquez possessed reasonable suspicion of traffic violations that justified his bulletin requesting that the Nissan be stopped for a welfare check.

Marquez had reasonable suspicion to justify a traffic stop.  Marquez testified that he observed the Nissan commit traffic violations at the hearing on this motion and the Court finds his testimony credible.  In light of the early-morning hour, and the erratic driving Marquez observed, it was not unreasonable for Marquez to request the vehicle be stopped.

### B.   MARQUEZ ALSO HAD REASONABLE SUSPICION THAT RODRIGUEZ-RODRIGUEZ WAS ENGAGED IN CRIMINAL ACTIVITY.

A second ground supports law enforcement's reasonable suspicion of Rodriguez-Rodriguez. The time of day the vehicles were traveling, that both had California license plates, and that the Nissan attempted to move across lanes -- perhaps to get a better view of Marquez driving behind the pickup truck -- all support Marquez' conclusion that the vehicles might be traveling together.  This reasonable deduction is important, because, once law enforcement officers discovered marijuana in the pickup truck that Gallardo-De La Cruz was driving, it established reasonable suspicion that

-16-

Rodriguez-Rodriguez might be involved in an enterprise to transport marijuana.  This suspicion constitutes reasonable grounds for the bulletin that Arellano issued after he arrived on the scene where Marquez had stopped Gallardo-De La Cruz.

Bencomo testified that, before he observed and stopped Rodriguez-Rodriguez' Nissan, he had heard a transmission that Arellano made indicating that there was an attempt to locate a red sedan with California plates.  See P.M. Transcript at 7:2-5 (Bencomo).  Bencomo stated that the transmission was associated with a Code Sixteen -- a reference to narcotics.  See id. at 7:5-7 (Bencomo).  Arellano testified that he had called central dispatch and re-issued Marquez' original bulletin after arriving on the scene where Marquez had pulled over the pickup truck and after Marquez briefed him on what had been found in the pickup truck.  Based on Marquez' reasonable conclusion that the vehicles were traveling together, and on the discovery of a large amount of marijuana in Gallardo-De La Cruz' pickup truck, Bencomo's stop of Rodriguez-Rodriguez' was a valid stop properly executed in response to a bulletin based on Marquez' and Arellano's reasonable suspicion.

## II.     THE OFFICERS' INVESTIGATIVE DETENTION OF RODRIGUEZ-RODRIGUEZ WAS REASONABLY RELATED IN SCOPE TO THE CIRCUMSTANCES THAT JUSTIFIED THE INITIAL TRAFFIC STOP.

Rodriguez-Rodriguez argues that, "even if sufficient suspicion for the initial stop existed, the subsequent detention of [Rodriguez-Rodriguez] exceeded the justifiable scope of the initial stop." Motion to Suppress at 5.  He argues that the foundation for law enforcement officers' suspicion was limited to the fact that a red sedan with California license plates was traveling directly in front of, and in the same direction as, the vehicle in which the marijuana was found.  See id.  Because law enforcement officers' suspicion was based on more substantial evidence than Rodriguez-Rodriguez

-17-

alleges, and because the circumstances of the stop could have led a reasonable officer to form an "objectively reasonable suspicion that illegal activity unrelated to the stop has occurred," United States v. Edgerton, 483 F.3d at 1047, the Court finds that the extent of Rodriguez-Rodriguez' investigative detention was not unconstitutional.

Before Bencomo stopped Rodriguez-Rodriguez, Marquez reasonably suspected that the red Nissan with California license plates traveling directly in front of and in the same direction as Gallardo-De La Cruz was associated with Gallardo-De La Cruz. This reasonable suspicion justified the initial stop of Rodriguez-Rodriguez under the first prong of the Tenth Circuit's test for constitutional traffic stops. Nevertheless, Rodriguez-Rodriguez suggests that, because he told Arellano that he knew nothing about Gallardo-De La Cruz or the pickup truck, any suspicion should have been dispelled, and his continued detention was constitutionally infirm. See Motion to Suppress at 5. Rodriguez-Rodriguez contends that "[t]his constitutional infirmity tainted all of the subsequent questioning and seizures." Id. Because the officers were entitled to rely on more than Rodriguez-Rodriguez' representations, however, the scope of the investigative detention remained related to its initial justification and the detention lasted "no longer than [was] necessary to effectuate the purpose of the stop." United States v. Millan-Diaz, 975 F.2d at 721.

Contrary to Rodriguez-Rodriguez' argument, the questioning and detention of Rodriguez after the stop were reasonably related in scope to the initial stop. Bencomo was justified in stopping Rodriguez-Rodriguez on the basis of Marquez' and Arellano's bulletins. Bencomo's first questions related directly to standard traffic law enforcement. Because Rodriguez-Rodriguez' answers to these questions raised additional suspicion regarding other unrelated unlawful activity, the continued detention was not unconstitutional.

-18-

Bencomo first asked Rodriguez-Rodriguez for his driver's license, proof of insurance, and proof of vehicle registration.  Bencomo noticed that the vehicle was not registered to Rodriguez-Rodriguez, but to a third party.  Second, Rodriguez-Rodriguez told Bencomo that he was coming from his brother's house, that his brother lived nearby, but that he was returning to Palomas, Mexico to fix the vehicle.  Bencomo testified that, because of the distance between Silver City and Palomas, and the desolate character of the road between the locations, it struck him as unusual that an individual with family nearby would attempt to traverse the distance without first addressing the mechanical difficulties.  See P.M. Transcript at 19:22-20:10 (Bencomo).

The additional suspicion that Rodriguez-Rodriguez' responses reasonably engendered validated continued detention.  The totality of the circumstances demonstrates the reasonable basis of the officers' suspicions.  More important, because the Court concludes that the police officers did not improperly stop Rodriguez-Rodriguez, or improperly extend his investigative detention, the subsequent seizures and interrogatory admissions were not the product of the officers' earlier unconstitutional violations.  The suspicions justified additional detention arising from Arellano's request for consent to search the car, Jasso's request to examine Rodriguez-Rodriguez' cellular telephone, and the additional post-Miranda questioning that resulted in confessional statements.

**IT IS ORDERED** that the Defendant's Motion to Suppress Physical Evidence and Statements is granted in part and denied in part.  The Court grants the Defendant's request for an evidentiary hearing.  The Court otherwise denies the Defendant's motion.

_____
UNITED STATES DISTRICT JUDGE

-19-

*Counsel:*

David C. Iglesias
  United States Attorney for the
    District of New Mexico
Albuquerque, New Mexico

-- and --

Gregory B. Wormuth
  Assistant United States Attorney
Office of the United States Attorney
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Mario A. Esparza
Las Cruces, New Mexico

       *Attorney for the Defendant*